Judge Ckenshaw
delivered the opinion of the Court.
John Moore, deceased, a son of Peter Moore, Sr., deceased, by his last will and testament, devised to his daughter Martha, forty and a half acres of land on which he lived, but, in the event of his said daughter’s dying without issue, the said land together with some bequests of personal property and slaves, to be equally divided between his brothers and sisters, George, Peter, and Patsy Moore, and Jane McClanahan. Martha Moore was then an infant, and said George Moore became her statutory guardian.
Whilst said Martha was still under twenty-one years of age, her guardian, the said George Moore, at her request and for her, purchased a tract of land in Bourbon county containing about forty-four acres. He took the deed for this land in his own name, but with no intention to appropriate it to himself. After Martha arrived to the age of twenty-one years, she intermarried with Noah S. Moore, and George Moore conveyed this land to Noah S., and his wife jointly. Not long after this conveyance, Martha died without issue.
In 1825, Patsy Moore, deceased, made her last will and testament, under and by virtue of which, the said Martha and Peter Moore, became entitled to a tract of about forty two and a half acres of land in Fayette county, subject, so far as Martha’s interest was concerned, to a life estate in Jane M’Clanahan. Said George and Peter Moore, were made the executors of Patsy Moore’s will, and' some arrangement was made between them and Jane M’Clanahan, (and as they allege *652 with Martha, also,) by which this tract was sold and convened by said executors to Joseph Smith, for about the sum of $S00. Four hundred dollars of this sum, (which from the pleadings, we take to be the amount of interest of Jane M’Clanahan and Martha, in this land,) was laid out in negroes. These negroes appear to have been held by Jane M’Clanahan, during her life, and, at her death, to have passed into the hands of Martha, and, on her marriage, to have gone with her into ihe possession of her husband, Noah S. Moore, where they have continued.
After the death of said Martha, Thomas L. Moore, William S. Moore, Robert PL Moore, and Mary Barton, and her husband, John Barton, who are the half -brothers and sister, of the said Peter, George and Patsy Moore, and Jane M’Clanahan, and uncles and aunt ■of the half blood to said Martha, brought this suit as heirs to said Martha, in the Bourbon Circuit Court, against the said Peter, George and Noah S. Moore, and the heirs.of the said Joseph Smith. They charge ■that by virtue-of the devise of John Moore, deceased, to his daughter, Martha, she was vested with an absolute fee simple estate in the said first mentioned tract of land, and that the same has descended to her heirs, the remainder over to the full brothers and sisters of John Moore deceased, ion the event of the death of his daughter, Martha, without issue, being void. They insist also, that the conveyance by George and Peter Moore, to Joseph Smith, of the .tract of about forty two and a half acres in Fayette, did not pass the title of said Martha, in the same; that the proceeds of the sale which were laid out in negroes, were the proceeds of Jane M’Clanahan’s life interest in the land, and that she became entitled absolutely to said-negroes; and that the conveyance of George Moore, to Martha, and her husband jointly of the tract in Bourbon, of about forty four acres, was illegal and improper, and that so far as the legal title to the same, passed to Noah S. Moore, he holds the same in trust for the heirs of the *653 sn'id Marlha; they pray that <heir ínteres! in all three tracts may be allotted to them as part of the heirs of said MarCut, and for their ir'eresv,. in said slaves.
1st question arising on the will of John Moore <0 his daughter Marlha Moore, in these words: “and if my said daughter Martha Moore should depart this life without issue, it is my will and desire that tbe aforesaid willed property be equally divided between my brothers and sisters.’ *
We will first enquire whether, in the devise by John Moore to his daughter Marina, of the first mentioned tract of land, the limitation to George, Peter, and Patsy Moore, ano Jane McClanahan. in the said said Martha should die without issue be such as the-law allows. Tne language used by tee testator is, “ and if my said daughter, MV; tea Moore, should depart this Ufa without issue, it is my will and desire that the aforesaid willed property be equally divided between my brothers and sisters, to wi;: George, Peter, and Patsy Moore and Jane McClanalntn.”
If- the testator meant by the words, “ should depart •this life without issue," a dying without issue living at the death of said Martha, the devise over is good, •and upon her death, the said brothers and sisters were invested with the estate. If, on the contrary, he meant a-dying without issue, at whatever remote period her •iss'ue might fail, then the contingency upon which the devise over is to take effect is too remote, the limitation is void,and Martha Moore was vested with an absolute fee simple, and at her death this land descended <to her heirs.
So far as we are advised, there has been no case before this Court, requiring it to give an interpretation ■to- tbe words dying without issue, or, to words of ■similar force and effect, when standing alone, and without any qualifying and restraining expressions. The decisions in all the cases of executory devises which have heretofore come under revision in this Court, in which the phrase, dying without issue, or, dying without heirs, has occurred, have turned mainly, if not entirely, upon other expressions, used by the testators in their wills, which manifested the intention to be to confine and limit the failure of issue to the death of the first devisee. In this case, we have not been able to find any such .qualifying expressions; and it be *654 comes oar duty to determine whether the testator, John Moore, meant by the use of the words, dying without issue, simply an indefinite failure of issue, or the failure of issue at the death of the first taker, Martha Moore.
Moore’s Trustees vs Moore’s heirs, reviewed.
Notwithstanding this Court has not decided what these words mean, unaided by other expressions, they have heretofore intimated, in strong terms, what their interpretation ought to be. In the case of Moore’s trustees against Moore’s heirs, that clear-headed and distinguished jurist, Chief Justice Boyle, makes the following remarks :
“ If, as was urged for the appellant, the expression idthout issue, used in this devise, must be understood to mean an indefinite failure of issue, then, as that event was of a character which might not for many successive generations have happened, the devise over must be deemed void ; but if, as was contended on the other side, the expression is to be understood to mean, dying without issue living at the time of the death, then it is plain that the devise over must take effect, if at all, within the allowed period to make such a limitation good. The latter of these meanings is much the most common and obvious. The former, indeed, appears to us to be a very strained and artificial meaning of the expression. According to this meaning, although a man should die leaving issue who afterwards dies,, yet he may be said to die without issue. In such a case, as he would be dead, and his issue extinct, he might, no doubt, with strict propriety, be said to be dead without issue; but without assigning to the words the most strained, and artificial meaning, he could not be said to have died without issue.” Yet he says, “ a majority of the modern cases agree that the expression of dying without issue, should be taken to import an indefinite failure of issue, unless the contrary appears from other circumstances in the will.”
Again: in the case of Brashear &c., vs Macey, &c., &c., (3d, J. J. M., 89,) the Court said:
Biasl ear, &c. vs Macey, (3 ./. J Marshall, 89,) reviewed. A case-of a devise of personal estafe where the terms “dying without issue” was construed to apply to the death of the devisee. ¡_,
The tetm issue in common parlance means immediate descend ants chlldien.
“ In a devise of personal estate, the expression dying without issue is invariably interpreted to mean ex vi termini, issue living at the death. But when the devise is of real estate, there is some diversity in the ancient authorities as to the import and effect of the same expression. Some of these authorities have endeavored to establish a subtle and arbitrary doctrine on this subject, neither the reason nor justice of which can be perceived by this Court.” The Court sn)rs further in that case : “ It is our opinion that the weight of authority is decidedly opposed to any distinction in the construction of the expression, dying without issue, in a devise-of personal or real estate, and therefore in both it means; the same thing.”
In that case the Court, in allusion to other circumstances in the will which assisted them in giving an interpretation to these words, and by the use of which the interpretation was determined, remark:
“ These we should consider conclusive, even if we be mistaken in the opinion that the expression, dying without issue, of itself and alone, means issue living at the death.”
This Court, then, if they have not decided what, ■when standing alone, these words mean, have, in their argument, expressed their opinion of their meaning, and pointed out what their decision would be, when necessary to make it.
Issue in common parlance, and as used generally by the community, signifies immediate descendants — children. And to tell those who have not made the law their study, that the phrase, “if Martha should die without issue,” does not contemplate her death without an immediate descendant of her body, at her death, but, a failure of those lineally descended from her, a hundred, or two hundred years subsequently to her death, is to tell them not only what surprises them, but what they do not understand, and what they cannot be easily made to apprehend. Such language, with such meaning, is “Greek” to them. And yet this artificial, *656 ungrammatical and unnatural interpretation of the phrase, is to be applied to the construction of their wills, in order to ascertain and give effect to their meaning! Is it not tantalizing the community to allow them the privilege of making their wills,' if the Courts, in construing and interpreting them, are to wrest the language they employ from its plain and obvious meaning and import; and, by applying strained, artificial and arbitrary rules of interpretation, make them mean what it is acknowledged they do not mean? We say what it is acknowledged they do not mean; for, not only many of the judges of our own country have substantially-made such acknowledgment, but Lord Thurlow is reported to have said, in the case of Bigge vs Bensley, (1, Bro. Cha. Rep., 188:) “I agree with you, that the general sense of dying without issue, is at the time of the death. That is the grammatical construction, and is the sense in general of those who use the words. (SeeFearne on Remainders, 483, note z.) In the appendix to Fearne on Remainders, note 4, page 612, is to be found the following language, said to have been used by one of the Judges of England: “This is the common sense and meaning of the vulgar, to-wit: when they speak of the death of a man without issue, this is to be intended of the death of him without issue living at the time of his death: and deeds are to be expounded according to the intention. And therefore', if one had asked a countryman whether C had died without issue, he would have answered, “No,” (although that issue died afterwards) because he had issue living at the time of his death; and expositions are to be made according to common in-tendment.”
The language oí ■wills is to he construed according to common intendment, as well as other instm m e n t s j technical rules must not defeat intention.
That expositions are to be made according to common intendment is agreed by all. To whatever instrument we may be giving a construction, the words which have been employed by their author should be taken in the sense in which he understood them; and, in cases in which technical rules have been - applied to *657 particular expressions by the Courts, if we are satisfied after an examination of the instrument, those technical rules will not carry out, but defeat the intention of the author, the technical rules must yield to the intention, and such a construction must be given as will effectuate it.
Chancellor Kent says that, “ the idea that testators mean by a limitation over upon the event of the first taker dying without issue, the failure of issue living at his death, is a very prevalent one, but it is probable that in most instances, testator’s have no precise meaning upon the subject other than that the estate is to go over, if the first taker has no posterity to enjoy it. If the question was put to a testator,” continues he, “ whether he meant by his will, that if his son, the first taker, should die leaving issue, and that issue should become extinct in a month or a year afterwards* the remainder over should not take effect, he would probably, in most cases, answer in the negative.” Now, with due deference, we think that testators do have a precise meaning upon the subject, and that meaning is, that if the first taker die without issue at his death, the estate is to go over. We take it that, when the-testators use such words, they have in their minds no other posterity than that which may be alive at the death of the first objects of their bounty, Theirminds, at the time, do not look beyond the death of the first taker. If a testator is reminded, at the time of'making his will, that the event supposed by the learned author might probably occur, he might, and we think would,, provide for it, -A testator, in our opinion, who had used such words, and who would answer the question put in candor, would say, “ I meant, if the first taker should die without issue, living at the time of his death, the estate should go over. The event which you mention did not occur to my mind when I was making my will — had I thought of it, I would have provided for it,” The testators meaning, in the supposed case, “hath this extent — no more.”
There is no reason why a devise applicable to per sonal estate, and one applicable to real in the same words should be diffidently construed.
In view of the interpretation which it is manifest this Court has heretofore been disposed t.o put upon the words under consideration, we have made no reference to English adjudications, and but a slight reference to any remarks of the English jurists. If those adjudications do not invariably interpret the words, dying without issue, where there are no other expressions in the will to confine the limitation to the death of the first devisee, to mean an indefinite failure of issue, there are but few exceptions.
We are free to confess that the weight of English authority is opposed to the interpretation which we are disposed to give them. But whatever may have been the causes which originated and continued the unnatural signification which the English Judiciary attached to these words,; whether owing to the genius of their government, or to the spirit of their laws growing out of their system of entailments, it is certain that their Courts of Chancery, as if conscious of original and continued error, “ seize with avidity any words in a will to tie up the generality of the expression, dying without issue, and confine it to dying without issue living at the time of the decease;” at least, in regard to terms for years, and personal estate; and we are utterly unable to see any good reason, in this country, for a different construction of the same words when applied to real estate. It is obvious that the judges of England would gladly be relieved from the shackles of judicial construction in which they have bound themselves, but their interpretation of those and similar words, having been the law of England for more than a century, it would not now be easy to retrace their steps; and to do so after such a lapse of time, might result in more harm than good. The law is understood, and their people have shaped their course accordingly. Here the law is not so understood by our people; it is unnatural, contrary to the common sense and common understanding of the community, and there can certainly be no propriety in our adopting *659 a construction which we believe to be at war with the intention of testators, and frustration of their benevolent purposes. The great object is to give effect to their intentions, and such we acknowledge to have been the aim of English jurists; but in England there has ever been, on the part of the opulent, a desire to take estates out of the channels of commerce, and confine them to their descendants for successive generations. There entails have for centuries been allowable, and their Courts have been fruitful in ingenious devices to dock them. The disposition amonglarge landholder's to keep their estates in their families from age to age, was opposed by a contrary disposition on the part of their judges. It was natural when it became their duty to interpret a will, to incline against any attempt to ereate a perpetuity ; and the disposition onvthe part of their citizens being to create them, it was easy for their judges to infer that such was the intention whenever expressions were used which would authorize the inference. Hei e, our citizens know that the law has denounced entails, and no disposition exists, as we believe, to create them — to trammel estates and restrain them to a long and successive line of descendants.
The law oí Kentucky, not authorizing an entail, the Courts should not presume that the citizen intended to create an estate which the law did not sanction.
Here,ouv laws are made by ourselves,through our representatives ; and we have chosen, in accordance with the genius and spirit of our government, to declare, by statute that estates shall not be entailed. The community knew this to be the law. We know that we can limit an estate for a life or lives in being, and twenty-one years and ten months thereafter. With this privilege we are content. Not a case has occurred in the numerous causes brought to this Court of a disposition to ereate a perpetuity, unless the one under consideration be .that case: our citizens have no disposition to •do so. We ought not, therefore, to presume the intention of a testator to be that which is contrary to the common sentiment of the community, contrary to law; and, aside from the judicial construction of the English Courts, and of some of the Courts of the United *660 States, not authority here, contrary to the natural import and common-sense meaning of the language-employed.
A devise of Innd to One “avd she should depait this life without isme." — Held to mean issue living at her death and not an indefi ' nite failure of issue, and a valid limitation.
Questions arising on the will of Patsy Moore.
Whatever, therefore, my have been the intention of testators in England by the use of the phrase “ dying without issue,” we are satisfied that, in this country, they mean by this phrase a ’dying without Issue living at the death of the first devisee. And consequently the limitation to George, Peter, and Patsy Moore, and Jane McClanahan is valid.
We well next consider whether the complainants are entitled to any relief upon their prayer to have allotted to them one-eighth of the tract conveyed by George and Peter Moore, to Joseph Smith.
This land was a part of the estate of said Patsy Moore, deceased. Before her death she made a will,, and after some specific devises and bequests, she gives, the remainder of her estate, both real and personal, to-her brothers and sisters, to wit: the said George and Peter Moore, and Jane McClanahan the portion which, should fall to the share of said Jane, to be held by the said Peter and George in trust for the' said Jane during her life, and after her death, and her said share to go-to the said Martha.
No division is alleged to have been made between-the devisees under this will, but we can draw no other inference from the pleadings, than that a division was made, and that the tract of 42£ acres lying in Fayette ’ county, was allotted to Peter Moore ánd Jane McClana-han. By the will of Patsy Moore, George and Peter Moore were made executors thereof; and, although no authority is conferred upon them to sell and convey, conceiving, as wTe suppose, that by virtue of their office of executors, they had such authority, they sold and conveyed this land to Joseph Smith, styling themselves, in the deed of-conveyance, executors of Patsy Moore, deceased. Peter and George allege, however, in their pleading that it being thought to be the interest of the said Jane McClanahan and Martha Moore, to sell *661 this land, the sale was made with their-consent. The consideration for which it was sold, was $800. Peter Moore being entitled to one-half of this tract, retained the sum of $400, and the other $400, (being the said Jane’s and Martha’s share of the proceeds of the sale,) was vested in negroes. The bill of sale for these ne-groes is executed to the said George and Peter Moore, for the use of the said Jane McClanahan during her life, and after her death, to said Martha Moore and the heirs of her body, “otherwise to belong to said George and Peter Moore.”
These negroes were taken into the possession of Jane McClanahan, and were used and enjoyed by her during her lifetime; and after her death, and during the minority of the said Martha, they were hired out by the said George as guardian for the said Martha, and at her majority, they were taken into her possession and ■enjoyed by her; and, upon her intermarriage with Noah S. Moore, they went with her to her husband, ■were jointly enjoyed by them during her life, and since her death they have continued ánd remained in the possession of the said Noah S. Moore, who claims to be their absolute owner.
This tract of 42-f- acres of land, belonged to the said Peter Moore and Jane McClanahan ; he having a fee simple interest in one-half of it, and she a life interest in the other half, remainder to Martha Moore in fee. Peter and George, as executors of Patsy Moore, had no-right to sell this land to Joseph Smith, or to any one ■else. Peter had a right to sell his own interest, but George had no interest in it unless he might be said to have had an interest as guardian for the said Martha. They could not sell and convey the interest of the said Jane and Martha, .so as to bind them, by mere parol consent and authority. But Jane had but a life interest, and being dead, she is not concerned in this suit. And George Moore having been the guardian of the said Martha at the time of the sale to Joseph Smith, the question is, whether she had not a right, upon arriving *662 at full age, cither to approve or disapprove the sále-lo reject or affirm it.
A statutory guar cliaii has no right to convert the real estate of his ward info person ally or personalty into really— except subjeclto the ratification of the wnrd: (Reeve Rom. Mel, 334 in note,) hint’s Com. 2 Vol. 25Ü Ree 1 Ramie 266 Contra.)
There is somecontrariety of opinion ns to the power of a guardian to convert his ward’s real estate into personalty, or his personalty into real estate ; but the weight of authority is decidedly against the exercise of such power. We take it to be the established doctrine, however, that he may exercise it, sub modo, subject to the ratification or rejection of the ward, when he shall arrive at full age. It is said in a note in Reeve's Domestic Relations, 334, that “guardians are generally subject to the same rules as other trustees. And the doctrine that a trustee cannot convert a trust fund of money into land, or real estate into personal, is well settled. Generally if the trustee does invest such fund in real estate, the cestui que trust may, at his option, accept the lands,or refuse them,and demand his money. That a guardian is so far subject to this rule, that he cannot thus change the property of his ward without the authority of a Court of Chancery, is also well settled.”
Kent remarks in his Commentaries,„ (2, Vol. 230,) “ I-t is said that such a power may be exercised by a trustee or guardian, in a clear and strong case, without the previous order of a Court of Equity ; but the infant when he arrives at full age, will be entitled, at his election, to take the land or the money with interest. And if the guardian puts the ward’s money in trade, the ward will be equally entitled to elect to take the profits of the trade, or the principal with compound interest, to meet those profits when the guardian will not disclose them.” And it is added, in a note upon, the same page, that it was intimated in 2nd Eden, “ such power might be exercised without a previous authority ; and it was allowed and sustained afterwards by the Supreme Court of Pennsylvania, in lsf Rawle, 266. But it is an extremely perilous act in a trustee, and cannot be recommended.”
A guardian having sold the land of his ward and purchased slaves with the proceeds, and the ward on arriving of full age having married and received the ne-groes into possession— Held that such acts amounted to a ratification of the acts of the guardian in changing the character of the property from real to personal.
A cestui que trust where the fund is converted into other property will hold the same right in the trust pioperly — it is subject to the same rights as if no change had token place.
The statute abol ishing the jus decrescendo does not apply to con veyances made bjr husband and wile.
From these authorities we conclude that the doctrine is, that the exercise of such power is always at the hazard of the guardian, being subject to the approval or disapproval of the ward, when he shall arrive at age. And that the ward, when of age, has the right either to affirm or disaffirm.
In this case, Martha Moore having received the ne-groes into her possession after she was twenty-one years of age, and they having been used and enjoyed by her, and by her and her husband during her life, and never having expressed any dissent to the change which her property had undergone, amount, in our opinion, to an affirmance of the change, and to an election to take the negroes instead of the land. It was not erroneous, therefore, in the Circuit Court to decree the title of the heirs of Joseph to be quieted.
We have seen that, in the purchase of the negroes which were bought with the proceeds of the interest of Jane McClanahan and Martha Moore in this land, George and Peter Moore attempted to secure the ne-groes to themselves, in the event the said Martha should die without heirs of her body. This they could not do. The proceeds belonged to Jane McClanahan for life, remainder to the said Martha absolutely — the proceeds were theirs, and the law would hold George and Peter Moore to have acted as trustees, and to have acquired the negroes wholly for the said Jane and Martha. The said Martha, being entitled, therefore, after the death of said Jane, to said negroes absolutely, the same interest, upon her intermarriage with Noah S. Moore, was vested in him.
It remains that we consider whether the complainants were entitled to a decree for a portion of the land conveyed by George Moore to Noah S. Moore, and his wife, the said Martha, jointly, after their intermarriage.
This is the tract of land which was purchased by George Moore, whilst he was the guardian of the said Martha, at her instance, and for her. It was paid for- *664 chiefly by the means of Martha, but, partly, with the means of George Moore. He says that he conveyed • the land to Noah S. Moore and the said Martha jointly, because he believed the conveyance to her could be made in no other way. Noah S. Moore charges that the reason assigned by George Moore for making the conveyance to himself and wife, jointly, is not the true one, but that he made it in that way at “ the earnestly expressed wishes and desires of the said Martha,” and because he had undertaken to pay that portion of the purchase money which had been advanced by the said George Moore out of his own means. .
Land was purchased by the guardian wiih the funds of his ward and conveyed to the ward and her husband. — II eld that upon . the death of the wife the husband did not succeed to the owner-chip of the land.
There is no proof in regard to Martha’s wishes and desires to have this land jointly conveyed to herself and husband ; and, if there were, it would not avail anything. True, we might, and do feel, a desire that her wishes, if she expressed any, in reference to her husband, could be complied with, but, unless the law will give him this land, any feeling which we might have, cannot be gratified.
Noah S. Moore, being a joint grantee with bis wife, and being, as he says, seized of the entirety during their joint lives, claims the whole of this land by survivorship. Had they been jointly entitled, he would, as survivor, have aright to the land — the statute of this State abolishing the jus accrescendi between joint tenants, not applying to estates granted jointly to husband and wife. But we" are of opinion they were not jointly entitled to the land. Before George Moore made the conveyance to Noah S. and wife, she was the equitable owner of the land ; as much the equitable owner, as she would have been the legal owner, had the conveyance, before that time, been made to her alone. It is clear that, in that state of case, she could have made no contract or co-tenancy with her husband, or with George Moore, by which to divest herself of her title ; and, it is equally clear to our minds, that no wish, .or desire, which she might have expressed to George Moore, or her husband, or to both, and thereby procur *665 ing a joint conveyance to herself and, husband, would enable her to invest her husband with a joint interest in the land.
A .feme covert can make no contract in respect to her real property in Kentucky, either to bind herself or her heirs, unless by adopting the precise means pointed out by the enabling stat utes — by solemn deed.
The general principle of the law is, that a wife cannot so contract as to bind herself; her contracts, are void. She is presumed, in most cases, and the case under consideration comes not within any exception to the rule, to act under the power of the husband, and by his coercion. And if she cannot malte a contract which would bind her, it is evident she cannot be bound by an act done merely by request — a fortiori she cannot be bound where it was done, as in'this case, as far as the proof shows, without even a request. If she 'was not bound neither are her heirs.
It is laid down in Story's Equity, page 617, that “a married woman is disabled from making any contract respecting her real property, either to bind herself, or to bind her heirs: and that this disability can be overcome only by adopting the precise means- allowed by law to dispose of her real estate ; as in England by a fine, and in America by a solemn conveyance.” So far, therefore, as Noah S. Moore was the recipient of the mere legal title to this land, he held the same in trust for his wife, and now holds the same in trust for her heirs.
The Circuit Court decreed the tract of land conveyed by George Moore to Noah S. Moore and wife, to the heirs of Martha Moore; and decreed said heirs to pay said George the sum of $503.09, besides interest, being the amount which said George had advanced out of his own money in the purchase of said land; and directed Noah S. Moore to surrender possession thereof to said heirs, and to convey to them all his right and title thereto, and in default thereof appointed a commissioner to convey; and decreed against him the sum of $390 for the rents of said land.
That Court was of opinion, and so decreed, that the tract devised by John Moore, deceased, to Martha Moore, and in default of her issue, to his full brothers *666 and giste]s, belonged to said brothers and sisters: that the heirs of Joseph Smith were entitled to the land which had been conveyed to their father, Joseph, and ordered their title to be quieted ; and that Noah S. Moore was entitled to the slaves which had been purchased with the proceeds of the sale of this land to Smith.
In addition to the errors assigned by the appellant and already disposed of, he complains that the Court erred to his prejudice in decreeing against him said sum of $390 for rents, and in dismissing his cross bill against William S. Moore, &c.
We perceive no error in this part of the decree. If, a3 we have decided, he is not entitled to the land, it results necessarily, that he is responsible for rents to the true owners ; and in regard to his cross bill, it is equally clear to our minds that the Court committed no error in dismissing it, as it was cone without prejudice. A3 administrator of his wife, he seeks a fund which he alleges to be in the hands of the defendants derived from the estate of Peter Moore, Sr., deceased. That estate has no connection with this controversy, and it is inappropriate and improper to adjust it in this suit, sufficiently burthened already with questions of its own,
Peter Moore assigns for error, that the Circuit Court improperly decreed the heirsof Martha Moore topayhim the sum which he advanced toward the land conveyed to her and her husband, instead of decreeing that amount to be paid by Noah S. Moore. We do not perceive why he should complain of this part of the decree ; if he gets his money, it ought to be immaterial to him from what source it comes, unless he may look upon himself as included in this decree, as one of the payors, and bound by its terms to pay a portion of it to himself. The decree does, in terms, include himself as one of the payors, he being one of the heirs of Martha Moore, but we understand the decree to mean, that the other heirs are to pay him said sum. This sum is a charge upon the land for which he would have a lein upon it, *667 but he does not complain because the decree is personal, and not in rem, but because the heirs are directed to pay it, instead of Noah S. Moore. It is true that Noah S. Moore promised to pay him this money, but this promise was made, as we understand it, in considtion of the land, and that consideration has wholly failed, and he is exonerated thereby from any responsibility.
Davis for plaintiff; Robinson <§- Johnson, Smith and Victor for defendants.
The complainants, in their bill, prayed to have their portion of the land allotted to them, which was not done by the decree, but no complaint is made on this score.
The decree of the Circuit Court, being in accordance with the foregoing views, is affirmed.
Noah S. Moore was directed to convey to the heirs of Martha Moore, the land which he was decreed to surrender to them; and a conveyance not having been made, the Court, upon the return of the cause, should have this conveyance made by him, or by a commissioner, to said heirs.