STEPHENSON
*vs.*
HAGAN.

---

## Stephenson *vs.* Hagan.

Case 35.

APPEAL FROM MADISON CIRCUIT.

W. R. by deed, dated August, 1789, conveyed to his son-in-law J. P. and D. P. his wife, a tract of land, "to have and to hold during the term of their natural lives, and for and during the term of the life of the longest liver of them, and at the decease of the said J. P. and D. P. his wife, or the longest liver of them, then the said land, with its appurtenances, shall ensue and descend to the heirs of the said J. P., lawfully begotten on the body of said D. P. his present wife, and shall be vested in such heirs in fee simple;" "but in case the said J. P. and D. P. shall depart this life leaving no issue of their two bodies, then the said land shall revert, return, and be again vested in the said W. R. (the grantor,) and his heirs." D. P. the wife, died, leaving three children, J. P. the husband, surviving, who sold the land. Within twenty years after her death, the heirs sued for the land, claiming under the deed. Held—1. That the grantees J. P. and D. P., took only an estate for life and that of the longest liver. 2. That a fee simple right vested under the deed in their children as purchasers. 3. That the conveyance was not in conflict with the rule in Shelly case, or, by the statute of 1776, an estate tail, converted into an estate in fee, and that the issue had right to the land.

Case stated.

William Robinson, being seized in fee of one hundred and sixty-five acres of land on Silver creek, in Madison county, on the 5th day of August, 1789, in consideration of natural love and affection which he had for his son-in-law John Pitman, and Dorothy P. Pitman, his wife, and the natural love and affection which he had for his two sons, William Robinson and Peyton Robinson, and the further consideration of five shillings each, paid by said John Pitman, and William and Peyton Robinson, the receipt of

which is acknowledged in the deed covenanted to stand seized of the said 165 acres of land, described by metes and bounds, to the following uses: First. That he had bargained and sold, and thereby granted, the said land unto the said John Pitman, and Dorothy his wife, "to have and to hold the said tract or parcel of land, with its appurtenances, unto the said John and Dorothy Peyton his wife, for and during the term of their natural lives, and for and during the term of the life of the longest liver of them, and at the decease of the said John Pitman and Dorothy his wife, then the before mentioned 165 acres of land, with its appurtenances, shall ensue and descend to the heirs of the said John Pitman, lawfully begotten on the body of Dorothy Peyton, his present wife, and shall be vested in such heirs in fee simple. But if, in case the said John Pitman and Dorothy his wife shall depart this life, leaving no issue of their two bodies, that then the before mentioned land and premises, with its appurtenances, shall revert, return, and be again vested in Wm. Robinson the elder, and his heirs, to and for the further uses, intents, and purposes hereinafter mentioned; and this indenture, so far as it relates to the interests of the said John Pitman and Dorothy his wife, and their heirs, shall then cease and determine." The grantor then covenanted that upon the death of John Pitman and wife, without leaving issue of their bodies, that he would stand seized, and granted and sold the said tract of 165 acres of land to his sons William Robinson and Peyton Robinson and their heirs forever, as tenants in common.

Before the date of this deed John Pitman and wife had one child, Irvine S. Pitman. Afterwards two others were born to them, one of whom died in infancy during the life of its parents. Mrs. Stephenson, the present appellant, is the other. Dorothy Peyton Pitman died in 1803. John Pitman, after the death of his wife, conveyed the land to Wm. Robinson, Jr., and the title regularly passed to Hagan, the appellee.

John Pitman died in 1839.   In 1853 Mary Stephenson, a widow, and Irvine S. Pitman brought this suit against James Hagan and Caleb Stone, asserting title to the land under the deed of their grand-father, William Robinson.   Stone had a very small part of the land in possession, if any, and the suit as to him was dismissed.   Pending the action, Irvine S. Pitman conveyed his interest in the land to Hagan and Stone, and the action has been since prosecuted solely to recover the interest of Mrs. Stephenson.   The facts and the law of the case being submitted to the court by consent, the judge rendered a judgment for the defendant in bar of the plaintiff's claim, and for costs, and she has appealed to this court.

*C. F. Burnam*, for appellant—

The right of the appellant to succeed in this case depends upon the construction of the deed of the 5th August, 1789, from William Robinson the elder, to John Pitman and Dorothy, for the land in contest.

Upon that deed the question arises, what estate did John Pitman take?   Did he take an estate for life? or did he take a fee tail which, by force of the statute of 1776, vested in him the fee simple title, which he had the power to pass to the defendants or their alienors.

We take the ground that an estate for life only passed to John Pitman, and by his deed no greater estate passed, and upon his death the fee became vested and the right to the possession of the land became complete in the appellant, as one of the children of Dorothy Pitman, to one-half the land conveyed by the deed of William Robinson, her grand-father.

In the construction of this deed, the intention of the grantor is to be sought and carried into effect, unless inconsistent with the rules of law.   It is believed that this intention is clear and manifest, and that it may be carried into full effect without infringing any principle of law, or rule of construction.

It cannot be doubted that the purpose of William Robinson, the grantor, was to give a life estate to Pitman and his wife, she being the daughter of the grantor, and the fee simple to their children at their death, begotten on the body of Dorothy P., the daughter. It was in the nature of a marriage portion. No one can doubt that by the word "*heirs*" he meant children. This was the stock in which the fee was to vest. The children of John Pitman, by a second wife, (and the proof shows he had one,) were to have no interest in the land. It was admitted in the court below, and we presume will not be denied here, that such was the intention of the grantor; but it was contended that the life estate created by the deed in John Pitman was by operation of the rule in Shelly's case, and the statute of Kentucky of 1796, (1 *Stat. Law*, 442,) enlarged into an estate in fee, and vested the fee simple title in John Pitman, which passed to his alienees. This we deny, and insist that it was the intention of Wm. Robinson, the elder, for a good and valuable consideration, to secure this land to his own posterity. He covenants to stand seized of the legal title to said land for the use of Pitman and wife during the life of the survivor of them, and *to vest absolutely in the children of that marriage*, and in default of such, then in Peyton and Wm. Robinson. For the phraseology of the deed the grantor is not probably responsible.

I will consider—1. The covenant to stand seized. 2. The estate given to Pitman and wife by the deed. 3. The estate of the issue of their two bodies. 4. The interest of Peyton and Wm. Robinson.

1. Then as to the covenant to stand seized. The rule in Shelly's case, relied on to bring this case within the 10th section of the act of 1796, is as follows: "When the ancestor, by any gift or conveyance, takes an estate of freehold, and in the same gift or conveyance an estate is limited either immediately or mediately to his heirs in fee or in tail; always in such cases the heirs are words of limitation and not of

purchase. (4 *Cruise Dig.* 326, *sec.* 2.) The circuit judge inquired if the statute of uses was in force in Kentucky at the date of the deed of 1789. It is immaterial to our purpose whether it was in force or not; for in either case the estate of John Pitman and wife could not be enlarged, and could not properly unite with the estate given to their heirs by this conveyance. For if there was no statute of uses in force in Kentucky at that time, the estate remained as at common law. The estate of Pitman and wife was equitable, and that to the heirs was legal; they could not therefore unite, for "the estate for life, and the subsequent limitation must be of the same nature, that is, both legal or both equitable; for if the first limitation be of a trust estate of freehold, and the subsequent one carries the legal estate, the rule will not apply." (4 *Cruise* 334, *sec.* 25–31; 4 *Kent's Com.* 215.) But if the statute of uses was in force and executed, (which can only be, so as far as the interest of the *cestui qui vie* extends,) still the two estates cannot unite, "for this rule does not take place unless the particular estate, and the remainder to the heirs, or the heirs of the body, are created by the same conveyance; for by the very words of the rule as stated in Shelly's case, both estates must be limited by the same gift or conveyance." (4 *Cruise, section* 19, 20, 21; 4 *Kent's Com.* 215.)

But in this case Pitman and wife take under the operation of the statute of uses, or by act of law, and the heirs take under the deed, or by the act of the grantor. The only way by which Pitman and wife can take an estate tail, is by uniting the estate given to them for life with the estate given to the heirs, and if this union cannot take place, from the different natures of their estates or from the different modes of their creation, the certain consequence is that they never had a greater interest than an estate for life, and if we are right in this view there is an end of the case. (See *argument of Wickham in Roy vs. Garnett,* 2 *Wash.* 27, and the decision of the court sustain-

ing that view, same book page 45.) This case arose under the act of Virginia of 1776, from which our act of 1796 was copied; and as our Court of Appeals said in the case of *Gist vs. Robinett*, 3 *Bibb* 3, I firmly believe this view is correct.

The deed of 1789 did not create in John Pitman an estate tail either general or special. It gave him only an equitable estate for life—a *usus fructus* as it is termed in the Roman law—entitling him to the annual product of the estate, without having the *proprietas* of the land itself. (*See Cruise*, 1*st volume*, 104.)

Let us now examine the estate of Pitman and wife in another view. The 11th section of the act of 1796 is an exception to the 10th, "if a less estate be not limited by express words, or do not appear to have been granted, conveyed, or devised by construction or operation of law." Now in this verbose deed there are not less than ten places in which express words occur, limiting this estate to the life of Pitman and his wife, or the survivors. It is given to them "for and during the term and time of their natural life;" "for and during the term of the natural life of the longest liver of them;" "and at their decease," &c., "then to the heirs;" "but should they depart this life leaving no issues of their two bodies, then to revert," &c.; "and their interest shall cease." After the decease of the said John Pitman and wife, for default of heirs of their two bodies, then it is given to W. and Peyton Robinson. There is not in the deed an expression inconsistent with these, and if they do not limit by express words an estate for life to Pitman, within the meaning of the statute, neither the words or the statute have any meaning at all; but if these "express words" do not limit an estate for life to Pitman and wife, they are not necessarily limited by "construction or operation of law," as expressed. (1 *Stat. Law*, 443, *supra*.) And this leads to the third division of the subject, viz: The estate which the heirs of Pitman and wife have

under this deed, and whether the words which designate that estate are words of limitation or of purchase. We find them designated as "the heirs of the said John Pitman, lawfully begotten on the body of Dorothy P. Pitman, his present wife," and then "such heirs," referring to the foregoing description. Again: we find them designated as "issue of their two bodies;" "should Pitman and wife depart this life leaving no issue of their two bodies, that then, &c." "the land revert," &c., and the interest of Pitman and wife, "and their heirs," referring to "issue of their two bodies," in the same clause, upon the supposition that all are dead, "shall then cease and determine;" and again the land is to revert to the grantor on the death of Pitman and wife, "for default of heirs of their two bodies." These are the only instances in which the word or words designating the persons in remainder are used, and they are used in contradistinction to the general use in which they have been employed in connection with the grantor, and with Wm. and Peyton Robinson; "his heirs," "their heirs," without any qualification. It is needless to multiply authorities to show that these expressions are *descriptio' personarum,* and are words of purchase. (4 *Kent,* 221; *Moore vs. Moore,* 12 *B. Mon.* 660.)

The facts and law clearly show that the estate created by this deed in John Pitman's *heirs or children,* (for the words are synonymous here), was a vested remainder in fee—a vested executed remainder at common law, was one by which a present interest passed to the party, though to be enjoyed in future, and by which the estate is invariably fixed, and to remain to another particular person or persons, after the particular estate is spent. (2 *Black.*) "If lands be limited to A for life, remainder to his first and other sons, and the heirs of their bodies, or remainder to the child or children of A, or to the issue of A, and the heirs of his or their bodies, no more than an estate for life will vest in A. And the words

son, child, or issue" will be construed words of purchase, and give a vested remainder. (4 *Cruise* 225–28, *Moore vs. Moore*, 12 *B. Monroe*, 153.) All the incidents in Blackstone's definition of a remainder are found in this deed. A particular estate was created to Pitman and wife, which was determined by the death of the longest liver of them in 1839. And immediate right to the future enjoyment of the land existed in the living heir or child of the two bodies of the tenants for life, at the date of the deed in 1789, and the deed provided for after-born children, and opened to receive such as were born during the pending of the life estate, as they came into being, and should continue in being at the determination of the life estate. (*Turner vs. Patterson*, 5 *Dana*, 275.) Nothing can defeat a vested remainder. (2 *Black.* 168–9; 4 *Kent*, 202; 2 *Cruise*, 238–9; 4 *Ib.* 335–28.)

And if there had been no heir of the description required at the creation of the particular estate, still the remainder would have been good, if any had been born during the continuance of the particular estate, or at the instant of its termination. (2 *Black.* 168–9; 2 *Cruise*, 241; 4 *Kent*, 248.)

4. Wm. and Peyton Robinson took a valid contingent remainder. It was based on the same good and valuable considerations as the conveyance to Pitman and wife, and would have vested *eo instanti* that the survivor of them had died without leaving issue of their two bodies. Here, again, Pitman and wife are limited to a life estate by "express words." Nor does this interfere with the vested remainder in the children of Pitman and wife in the mean time. (2 *Cruise*, 225, 47 *to* 50.) You cannot raise a fee upon a fee, but may limit them alternately. (See *Jackson's adm'r vs. Sublett*, 10 *B. Monroe*, 472.)

Suppose John Pitman and wife, with all their children, had all died at once, the moment they became invested with the estate, what would have become of it? It could not have gone to any other heirs of John Pitman and wife, or either of them, for it was

expressly limited to the heirs of John Pitman, lawfully begotten upon the body of Dorothy P. Pitman. It could not have reverted to the grantor, for the statute of uses would have stood in the way. It could have gone no where, unless the limitation to Peyton and William Robinson was good, and if good, then it is a perfect demonstration that Pitman and wife could, in no event, have taken a greater estate than one for life, limited to them by "express words" in the deed. How, then, can it be urged that this deed creates an estate tail, as the law aforetime was? It cannot be so.

In the case of wills, the construction I contend for, has been repeatedly sustained by this court. (*Hart vs. Thompson*, 3 *B. Monroe*, 86; and cases there cited; 10 *Ib.* 472; *Deboe vs. Lowen*, 8 *Ib.* 619; *Prescott vs. Prescott*, 10 *Ib.* 56; *Moore vs. Moore*, 12 *Ib.* 453.) It has also prevailed in the construction of deeds. *Green vs. Boone*, 5 *B. Monroe*, 596, is precisely this case, except that slaves was the subject of transfer in that deed, and that there *children* is the term employed. There a father, by deed, conveyed to a married daughter and her *children*, certain slaves, to be equally divided between them at the death of their mother; and the court held that there vested in the children of the daughter then in being, and in the after-born children, as they came into being, an estate in remainder; and refer to the case of *Turner vs. Patterson*, 5 *Dana, supra*, as authority on that point. (See also *Jarvis vs. Quigley*, 10 *B. Monroe*, 104.) The same reasons relied upon by the court in the last case cited, apply with equal force to the case under consideration, and the covenant in this case to stand seized to the use of the grantees, shows the intention to provide for offspring, and is in the nature of a marriage settlement.

I think I have clearly shown that the rule in Shelly's case does not apply to this case, even if that rule was of practical application in Kentucky, which

is however denied, and the court are referred to the case of *Turman vs. White*, 14 *B. Monroe*, 560.

A reversal is asked.

*S. Turner*, on the same side—

It may not be improper to suggest, before discussing the more important points presented in this record, that it is very evident that the draftsman of the deed of 1789, from William Robinson, has not used the most appropriate terms to convey the meaning of the grantor in the deed; that he was not acquainted with the legal meaning of some of the terms employed in the deed. Sometimes using the terms *heirs* and *issue* as meaning the same, and the word *descend* where it is evident an estate by purchase was meant; all of which is, as we insist, rendered plain by the whole tenor of the deed.

The words "heirs of the said John Pitman, lawfully begotten on the body of Dorothy Peyton Pitman, his present wife," taking the deed as a whole, should not be construed to be words of limitation, but as descriptive of the persons who should take at the death of Pitman and wife. We are authorized to put this construction on the deed from the decision of this court, in the case of *Prescott vs. Prescott*, 10 *B. Monroe*, 56. The whole tenor of the deed shows that such was the intention of the grantor, because that *intention* is according to the case cited, and the recent case of *Turman vs. White*, 14 *B. Monroe*, 560—the cardinal rule in the construing all instruments of writing.

The case of *Prescott vs. Prescott* is very much like the present case. It is true that in that case the court laid some stress upon the words "to be equally divided" between the heirs of the body of Chloe Sawyer; but it is manifest from the whole opinion that the court would have decided the case in the same way, if those words had been omitted, as the case is made to turn finally upon the intention of the maker of the instrument; and in the case of *Turman*

*vs. White, supra,* the same doctrine, that of carrying out the intention of the maker of the instrument, is given a controlling effect in its construction, where it is not in conflict with law.

We will proceed to give some reasons why the term heirs, as used in the deed of 1789, does not mean the general heirs of Pitman and wife, but on the contrary to be taken as merely descriptive of the persons who should take at the death of Pitman and wife. The land is conveyed to Pitman and wife during the term of their natural lives, and the longest liver of them; thus manifesting an intention on the part of the grantor, not to give either a fee simple or a fee tail, but on the contrary, to give only an estate for life in the survivor. Again, the estate is not given to the heirs of their bodies, indefinitely; but is given to the persons who shall be such heirs at the death of the survivor. This idea is enunciated four different times in the deed by the word *then*—that is, at the death of the survivor. Besides, it will be seen that the persons who are described as the heirs of the body of Pitman and wife, at the death of the survivor, are then to take, not in fee tail, general or special, according to the ancient law, but are to take as heirs in fee simple—thus manifesting an intention that they should constitute new roots of inheritance, and at their deaths the land should descend to their heirs generally, even if those heirs were not the descendants of John and Dorothy P. Pitman, and this could not be, according to the ancient law of fee tail, if such an estate were vested in John Pitman, and passed by descent to the heirs of the body of John and Dorothy P. Pitman, as the said John and wife would, in that case, be the roots to govern the inheritance, and this is a stronger circumstance, in our estimation, than the words "to be equally divided;" used in the writing, under examination, in the case of *Prescott vs. Prescott, supra,* to show that John Pitman did not take what at common law was a fee tail. Further, it will be seen that, according to the

position assumed by the appellee, Robinson, the grantor, is made, in effect, to give the estate to his son-in-law in fee simple, if he survived his wife, when the object of his bounty was, beyond doubt, his daughter, Mrs. Pitman and her children, and it would be impossible to make a rational man believe that the grantor intended or knew that such was the effect of the deed he was making. The ignorance of the draftsman of this deed is strongly displayed in this, that instead of the estate being conveyed to Mrs. Pitman, it is conveyed to her and her husband jointly, and to the survivor ; and if the husband took what was a fee tail at common law, as is now contended by appellee, under the act of 1776, he became invested with a fee, and the power to deprive Mrs. Pitman and her children, without her or their consent, of all their right in the land in controversy. Can this court believe that the draftsman of this deed knew, or that the grantor intended, such to be its effect? If not, then, as the intention is to govern, especially as that intention is not inconsistent with law or policy, and that intention plainly pointing out that Pitman and wife only took a life estate, and their children as purchasers, can this court refuse the relief prayed for in this suit ?

There is another clause in this deed strongly sustaining the construction which we place upon it. It is the clause which speaks of Pitman and wife leaving no issue ; not an indefinite failure of issue, but leaving none at the death of the survivor ; as the deed expressly declares "that then the before mentioned land," &c., "shall revert, return, and be again vested in the said William Robinson, the elder," &c., "and this indenture, so far as it relates to the interests of the said John Pitman and Dorothy his wife, and their heirs, shall then cease and determine." This paragraph, when taken in connection with that giving Pitman and wife and the survivor a life estate, seems to leave no shadow of doubt, that no larger estate was to be given to Pitman and wife.

Having ascertained the intention of the grantor in the deed under consideration, and that intention being consistent with law, according to the decision of this court in the case of *Turman vs. White*, *supra*, in which all the questions arising in this case are elaborately and luminously discussed, we feel it unnecessary to say more on this branch of the case.

The rule in Shelly's case, relied on by the appellee, was always considered in England, where public policy upheld it, as inconsistent with reason and right, and as violative of the manifest intention of the grantor; and slight expressions or circumstances were seized on by the courts to except cases out of its unjust and oppressive operation; and the American courts have extended the number of exceptions to the application of the rule, and give common sense its full effect, until the rule itself, until repealed by express legislation, could scarcely be regarded as a rule either in England or America.

It will be seen by reference to the English statute, enacted in 1832, when the reformers came into power, that the rule in Shelly's case, as well as many other technical rules, applicable to real estate, were abrogated. And by an examination of the Codes of New York and Virginia, it will be seen that they have followed the English Parliament. The chapter in the Revised Statutes of Kentucky, on real estate, or a great portion of it, embodies the same principles embraced in the enactments of New York, Virginia, and England, above suggested; and they are only the embodiment of public opinion in America condemnatory of the rule in Shelly's case, and other rules inconsistent with common sense and the intention of parties. Even in England wardships, and all the consequences growing out of the feudal system, bearing upon the rule in Shelly's case, have long since been swept away by English legislation, and never applicable to America. In this country, the other reason given in England for the rule in Shelly's case never existed; here, no man can put his estate,

real or personal, by any conveyance or subterfuge, out of the reach of his creditors; but even that reason, if it existed here, would not apply in this case, as John Pitman and wife were not the owners of this estate before the deed under consideration was executed; and it was never liable for their debts, and even after the deed was made, it would have been liable for the debts of the grantor. The fact that the deed was made whilst Kentucky was a part of Virginia, cannot take this case out of the influence of the decisions of the courts of Kentucky, even if it were conceded that the decisions of the courts of Virginia had been different. This deed was made but a few years after the abolition of entails in Virginia, and this court, in a long train of decisions, has established a construction bearing against construing instruments to create an estate tail, and making them pass to the first taker only an estate for life, which, prior to 1776, would have been construed estates tail.

Besides, in 1789, Kentucky had been erected into a separate district, and was mainly governed by a separate policy from the residue of the State of Virginia, and in the preparatory stage of becoming independent. Hence we conclude that a deed made in 1789 should be construed as a deed made in 1809 for land in Kentucky, and there never has been any judicial intimation to the contrary. A reversal is asked. (See 12 *B. Monroe*, 655–6–7; 10 *Ib.* 106; *Ib.* 59.)

*W. H. Caperton & D. Breck*, for appellee—

This case turns upon the construction of the deed from Robinson and wife to Pitman and wife. The consideration is sufficient to sustain it as a covenant to stand seized, or as a deed of bargain and sale, and whether regarded as the one or the other, or, as seems to have been the intention, as containing both, the effect would be the same as between the parties to this suit. The covenant seems intended to apply first to the formal deed of bargain and sale to Pitman

and wife, but it has no effect upon its construction. The same estate passed by the deed without it as with it; whether in any event it would have been important in reference to the conveyance to Peyton and William Robinson, we need not inquire. A covenant to stand seized has the force and effect of a deed of bargain and sale, and is construed in the same way. (4 *Kent*, 492; 4 *Cruise*, 272-3, 300, 1, 2; *Greenleaf's Cr.* 4 *vol. top page*, 320-21, 360, 1, 2.)

In the premises of the deed there is no gift or grant to the heirs; but the grant to Pitman and wife would at the time or date of the deed, have vested in him an estate in fee simple, but for the habendum, and upon that the main question in this case arises.

As the law aforetime was, or at common law, it created an estate in special tail in John Pitman, and an estate for life in his wife. (4 *Cruise*, 296 *to* 303, or *Greenleaf's ed.* 4 *vol.* 360, 1, 2, and authorities there cited.) But we need not leave this honorable court for authority. The case of *Humphreys vs. Ayres* is strikingly analogous, and was controlled by the same rule of law deemed applicable to this. That case was relied upon in the court below as decisive of this. It is true in the recent case of *Turman vs. White's heirs*, the court say the opinion in the case of *Humphreys vs. Ayres* "was withheld from publication as if of doubtful authority." We do not, however, understand it as overruled. It certainly is not in express terms, nor is it necessarily overruled by any questions decided in the latter case.

The deed in our case manifestly created an estate tail in the tenant for life. Of that the court say there can be no doubt. The court, moreover, say, in allusion to the Shelly rule, that "in case of deeds, it has been considered inflexible."

These propositions, according to the common law, as in force in Virginia in 1776, were incontrovertible. In *Turman vs. White* the deed did not create an estate tail. One case was within the statute changing estates tail into fee simple; the other was not. One

case was controlled by the law and the rules of construction in force in Virginia in 1776, or the common law. The aforetime in our statute clearly refers to that period. Such was the construction by the courts in Virginia, in reference to the acts of 1776 and 1785, converting estates tail into fee simple. The other case was not necessarily governed by the law at that time.

The opinion in *Turman vs. White* seems to rest mainly on the ground that the rule in Shelly's case was not in force in Kentucky, or, at any rate, that it was not of binding authority; but whether it is or ever was in force here, or whether a good rule or a bad one, so far as the case under consideration is concerned, is wholly unimportant. The deed in this case was executed and recorded in Virginia, before Kentucky became a State, and of course its construction and effect must depend upon the law of Virginia at the time.

The common law was adopted and declared to be in force in Virginia, in July, 1776. (1 *Litt. Laws of Ky.* 390.) No rule of the common law was better settled or more emphatically recognized by the judicial tribunals of England, than the rule in Shelly's case. As a part of the common law, it was therefore in force in that State, and so expressly admitted and recognized, after the date of the deed to Pitman, in *Roy vs. Garnett*, 2 *Wash.* 9; *Tate vs. Tally*, 3 *Call* 354, and other cases. The same construction which we contend for was given to the acts of 1776 and 1785— that they did not change the law or rules of construction of either deeds or wills; that the law in force prior to their passage in that respect was to govern, and if when thus tested and determined, they came within their provisions, they took effect. Pitman, therefore, by the deed in this case, as we contend, took an estate in fee simple.

It is not deemed important to inquire how the grantor and covenantor intended the heirs should take, whether as purchasers or by descent. The law

in view of the terms of the limitation, decides that question, irrespective of his intention. But express technical words of inheritance and limitation in tail, are used and should be construed in their legal sense. The very words *ensue* and *descend* emphatically indicate an intention that they were to take by *descent*. There is no *designatio persona* or *personarum.* The word *heirs* is not restrained to fit son or children; on the contrary it was clearly intended that the entire succession, children, grand-children, and great-grand-children, should take as heirs, and as has been held, if they take in the character of heirs, they must take in the quality of heirs.

A greater latitude of construction has been indulged, both in England and this country, in wills than deeds. The rule in reference to deeds or legal estates, as Chancellor Kent says, has been of prescriptive and uncontrollable authority, and, as said by this court, "considered inflexible."

*Prescott vs. Prescott's heirs* was a devise, and in chancery, and turned mainly upon the words "to be equally divided among the heirs of the body," like the devise in the English cases, "to take as tenants in common" — words clearly indicating children. The case relied on as sustaining the case of Prescott, of *McNair's adm'r vs. Hawkins*, was a devise expressly to children, "to share equally, sons and daughters." This case differs materially from both those cases, even if the limitations had been in deeds instead of devises. The conveyance of the reversion, in case Pitman and wife should die having no issue of their two bodies, or, as stated, in default of heirs of their bodies, can have no influence upon the previous limitation. We are aware this court decided in *Moore vs. Moore* that the words "dying without issue," means and should be so construed, "without issue at the death of the first taker." But such was not the construction given by the courts in Virginia, at the date of the deed in this case and afterwards, and is not known to have been since. "Without issue, default

of issue" &c., in reference to lands, were construed to mean an indefinite failure of issue. (3 *Call*, 342, *Hill vs. Burrow; Tate vs. Tally, supra.*) And in giving construction to this deed, we insist that the laws of Virginia at its date, and the authoritative decisions of her courts should govern. But it is not supposed the previous limitations will be affected by the subsequent portions of the deed, whether the conveyance of the reversion or the ultimate limitation over to Peyton and William Robinson was valid, or whether an estate tail was not thereby created in Pitman, or in Pitman and wife, it is not deemed necessary to inquire, believing that the first limitation will dispose of the case, and in favor of the defendant.

We know that the whole subject, involving the questions arising in this case, has, within a few years past, been most critically and elaborately examined by members of this court; and we, therefore, forbear further argument or reference to authority.

The deed in this case was made more than sixty-five years since, and the land was aliened in fee by Pitman with general warranty, more than fifty years since, and we cannot suppose that at either period there could have been any doubt as to Pitman's title being a fee simple.

The act of Virginia of 1776, abolishing entails, will be found in *Henning's Statutes at large*, 9 *vol. page* 226. The act of 1785, in the appendix to the 4 *vol. Litt. L. Ky.* 438.

Chief Justice MARSHALL delivered the opinion of the Court—

January 11.

On the 5th day of August, 1789, William Robinson, Sr., and Sarah, his wife, executed a deed, which purports to be an indenture between themselves, of the first part, and John Pitman and Dorothy P. Pitman, of the second part, and Peyton Robinson and William Robinson, Jr., sons of said William, of the third part, by which, "for and in consideration of the natural love and affection he (William Robinson, Sr.,)

W. R. by deed, dated August, 1789, conveyed, to his son-in-law J. P. and D. P. his wife, a tract of land, "to have and to hold during the term of their natural lives, and for and during the

STEPHENSON
*vs.*
HAGAN.

term of the life of the longest liver of them, and at the decease of the said J. P. and D. P. his wife, or the longest liver of them, then the said land, with its appurtenances, shall ensue and descend to the heirs of the said J. P., lawfully begotten on the body of said D. P. his present wife, and shall be vested in such heirs in fee simple;" "but in case the said J. P. and D. P. shall depart this life leaving no issue of their two bodies, then the said land shall revert, return, and be again vested in the said W. R. (the grantor,) and his heirs." D. P. the wife, died, leaving three children, J. P. the husband, surviving, who sold the land. Within 20 years after her death, the heirs sued for the land, claiming under the deed. Held—1. That the grantees J. P. and D. P., took only an estate for life, and that of the longest liver. 2. That a fee simple right vested under the deed in their children as pur-

hath for said John Pitman and Dorothy, his wife, the daughter of the said William, and also for and in consideration of the natural love and affection which he hath to his said sons, and for and in consideration of the sums of five shillings, severally paid by Pitman and wife, and the said P. and W. Robinson, the receipt of all which is acknowledged, after covenanting to stand seized, &c., for the following uses, &c., they, the said Wm. Robinson, the elder, and Sarah, his wife, granted, bargained, and sold to said John Pitman and Dorothy, his wife, a tract of one hundred and sixty-five acres of land, in the county of Madison, then in the State of Virginia; to have and to hold during the term of their natural lives, and for and during the term of the life of the longest liver of them, and at the decease of said John Pitman and Dorothy P., his wife, or the longest liver of them, then the said one hundred and sixty-five acres of land, with its appurtenances, shall ensue and descend to the heirs of the said John Pitman, lawfully begotten on the body of said Dorothy, his present wife, and shall be vested in such heirs in fee simple. But if in case the said John and Dorothy shall depart this life, leaving no issue of their two bodies, then the said land and premises, &c., shall revert, return, and be again vested in the said Wm. Robinson the elder, and his heirs, to and for the uses hereinafter mentioned. And this indenture, so far as relates to said John and Dorothy, and their heirs, shall then cease and determine." The deed, then, in case the said land shall revert to said William, Sr., after the decease of said John and Dorothy, for default of heirs of their two bodies, grants, bargains, and sells to the said Peyton Robinson and Wm. Robinson, Jr., their heirs and assigns forever, the before-mentioned tract of one hundred and sixty-five acres, to have and to hold the same unto the said P. and W. Robinson, Jr., and their heirs as tenants in common, to the only proper use, &c., of the said Peyton and William, Jr., and of their heirs and assigns forever.

Then follows a warranty of said land to and for the uses and intents mentioned before. The land conveyed by this deed has been held under it ever since the date of the deed. In 1803, Dorothy P. Pitman died, before her husband. In 1804, John Pitman sold and conveyed the land to William Robinson, under whom the land has been since held. John Pitman died in 1839. In 1853, this action was brought by Mary J. Stephenson, then a widow, and Irvine S. Pitman, the only living children of the marriage of John and Dorothy Pitman, grantees of William Robinson the elder, and the heirs of their bodies, to recover the land from Hagan and Stone, who were in possession. During the progress of the suit, Irvine S. Pitman released whatever title he had to the defendants, and the suit was dismissed as to him. The case then proceeded in behalf of Mary J. Stephenson alone, and the law and facts having been submitted to the court, judgment was rendered against the plaintiff, who has brought it to this court for reversal.

The deed and facts above stated present the whole case. And it is apparent, that on the whole case, the only question is, whether the conveyance to John Pitman, created in him, as the survivor of his wife, a fee tail or a mere estate for life. If the former, the fee tail was turned into a fee simple by the statute of 1776 ; his children born of the marriage with Dorothy P. Robinson took nothing by the deed, and his sale and conveyance to William Robinson, in 1804, passed the fee simple in the land. If he was only a tenant for life, his sale and conveyance passed the estate for his life only, and the children of the marriage with Dorothy P. Robinson, to whom the land was given in remainder, became entitled on his death to the possession. And his daughter, Mary J. Stephenson, was entitled to a judgment for one undivided half of the land, in this action, commenced within less than twenty years after his death. It is clear that the rights of these parties depend upon the construction

chasers. 3. That the conveyance was not in conflict with Shelly case, or, by the statute of 1776, an estate tail, converted into an estate in fee, and that the issue had right to the land.

and legal effect of the deed of 1789.   In determining
which, we have been most earnestly urged to resort
to the law as it existed before the passage of the Vir-
ginia act of 1776, abolishing entails, as furnishing,
according to that act, the only test for deciding
the character of the estate limited to Pitman by the
deed in question; which, as having been made by
parties residing, at its date, in Virginia, and for land
then in that State, it is contended, was then, and is
now peculiarly subject to such construction and ope-
ration as were fixed upon by the law of the time in
the State of Virginia.   As a part of that law, the
rule in Shelly's case, abolished by the Revised Statutes
of this State, and disregarded by this court in the re-
cent case of *Turman vs. White's heirs*, 14 *B. Monroe*,
has been adverted to, and its policy, even in this
country, has been vindicated on the ground of its pre-
venting the estate in cases to which it applies, from
being locked up during the period of a life, however
long, and then being subject to a division into mi-
nute particles among numerous heirs, the infancy of
some or all of whom may render portions or the whole
of it still longer inalienable.   But this evil, great or
small, is not removed by the abolition or rejection of
the rule in Shelly's case.   The general law of the
land, even before the adoption of the Revised Stat-
utes, allowed, as they now do, a limitation after an
estate for life, provided it is so constructed as to take
effect, if at all, within a life or lives in being, and
twenty-one years, and the usual period of gestation
afterwards.   The abolition or rejection of the rule in
Shelly's case, does not either give or enlarge this
power of disposition, but only allows it to be made by
words which the parties understand and use for
making such a disposition, and suppose to be effec-
tual for that purpose, but which, under the rule in
question, would often so operate as to defeat the man-
ifest intention of giving to the first taker a restricted
interest and power, which would not enable him to
destroy the interest intended to take effect in others

after his death.   But, without dwelling further upon a question of policy which is no longer an open one in this State, and conceding that at the date of this deed the rule in Shelly's case was in full force in Virginia, as a part of the 'law of real estate, we are of opinion that even if that rule and the whole law of entailment, as it existed at and prior to the date of the act 1776, is to be applied as a test of the estate which Pitman, as the survivor of his wife, took under the deed now before us, he did not take an estate tail, (converted into a fee simple,) but only an estate for life, which admitted, according to the law as then and now existing, of a valid limitation to persons described as heirs of the body of himself and his wife Dorothy.

Even under the law as above supposed, it was as it is now, a principle that the intention of the parties to any valid instrument or contract, is to be ascertained, and so far as it is consistent with the rules of law to be effectuated, if the terms of the instrument are such as can have the intended operation.   If the rule in Shelly's case, or its principles, had never existed, there would have been no principle in the English law, which prevented an estate from being effectually given to one for life with remainder to his heirs, general or special, to take as purchasers at his death. It is that rule—or the principle embodied in it—which determines that the estate of inheritance intended to to vest in the heirs, shall vest in the ancestor to whom an estate for life is given by the same conveyance, so that he will have the fee either immediate or in remainder, and in tail or in fee simple, according as the limitation in remainder is immediate upon his life estate or otherwise, and is to the heirs of his body, or to his heirs general.   As the rule applies expressly to the case of the gift to the first donee, being a freehold, that is, an estate for life, the intention that he shall have but an estate for life, however strongly expressed, was not deemed sufficient in itself to repel the application of the rule, if the gift in remainder be

to his heirs, general or special, without further quali-
fication. Nor, in such a case, would it have been
deemed sufficient to state expressly in the instru-
ment of donation, that the heirs were intended to
take, as purchasers, which is implied from the gift to
the ancestor for life, and although heirs, or heirs of
the body, may, in some instances, take as purchasers;
yet, as in their legal sense, these words are words of
limitation, applying to and describing the estate of the
ancestor who first has it, and not that of his heirs, and
properly implying a descent to them from that ances-
tor; and as, moreover, the words include, in their
legal sense, the whole line of heirs of the sort descri-
bed, and not merely such persons as may come within
the description at a particular time, these words were
uniformly interpreted, in their legal sense, as compri-
sing the whole line of heirs, general or special, to
take, if at all, in the character of heirs, and by de-
scent from the ancestor named, unless the estate
which is intended to vest in them could not, by the
terms of the gift, come to them as heirs of the first
donee, or unless the legal sense of the words used in
describing them as heirs, was repelled by other ex-
planatory words or circumstances in the instrument,
showing clearly that they were used in a more re-
stricted sense, and as a mere description of the
persons who were to take when the life estate deter-
mined.

It might be always inferred from the limitation of
the estate to the first donee for life, with remainder to
his heirs, or to the heirs of his body, that the donor in-
tended that the heirs should take as purchasers, and
not by descent; and in this State, the repeal of the
rule in Shelly's case, which has been mentioned, ari-
ses from, or consists in, the affirmative enactment in
direct opposition to the rule, that when an estate is
given to one for life, and after his death to his heirs
or the heirs of his body, &c., it shall be construed as
an estate for life, only, in the first donee, and a re-
mainder in fee simple to his heirs or the heirs of his

body, &c. This enactment, intended, doubtless, to effectuate the presumed intention of the conveyance, as inferred from the ordinary use and sense at the date of the act, of the terms and structure of the limitation supposed, gives full effect to the limitation, without regard to the technical sense of the words. The law, as understood and administered prior to the Virginia act of 1776, and as applied to this deed at its date, interpreted these words according to their legal sense, unless it clearly appeared from the instrument itself, that they were used in a different sense.

In stating the rule in Shelly's case, the words "heirs and heirs of the body," are used in their legal and technical sense; and, as the rule applied to limitations in which these words were not used, but which were made in other words requiring the same interpretation, and indicating the same intention, so it was not applied to limitations containing the particular words above mentioned, unless they were used in their technical sense of denoting the whole line of heirs in succession. It was not a rule of construction or interpretation, by which the sense of particular words, and the intention with which they were used, was ascertained or fixed, but a rule of law, declaring the effect of a certain disposition of land, and having no operation in the particular case, unless there be such disposition, and no application until it was ascertained, by the aid of other rules and principles, that according to the intended sense (not the intended operation) of the words used in framing the limitation in question, the conveyance made the particular disposition to which the rule applies, and which it virtually prohibits, by giving to it an operation and effect regardless and most frequently destructive of the intention with which it was made.

That this was the doctrine of the law as it aforetime was, and as it existed before and at the date of the act of 1776 abolishing entails, is, as we think, manifest from the remarks on the subject, made by Mr. Fearne, in commenting on the observations of

Mr. Hargrave concerning the rule in Shelly's case, in 1 *Harg. Law Trials*, 574–5. The authority of two writers so astute in their reasoning, so laborious in their investigations, and so confessedly learned in this branch of the law, is deemed more satisfactory than any exploration which we might make or attempt, of the labyrinth of cases, from a deep study of which, aided by all the lights of experience and observation, they have drawn conclusions intelligible and consistent. Mr. Fearne, in pages 188 and 189 of his work on Remainders, after remarking that the inflexible degree of imperative control which Hargrave attributes. to the rule, would hardly be reconcilable with the long established principles applicable to the construction of wills, were it not for his resting the admission of the rule upon a previous question referable to the testator's intention, proceeds to say, that " Nothing can be better founded than Mr. Hargrave's doctrine, that the rule in Shelly's case is no medium for finding out the intention of the testator ; that, on the contrary, the rule supposes the intention already discovered, and to be a superadded succession to the heirs, general or special, of the donee for life ; by making such donee the ancestor, terminus or *stirpes*, from which the whole generation or posterity of heirs is to be accounted; that whether the conveyance has or has not so constituted an estate of freehold, with a succession engrafted upon it, is a previous question, which ought to be adjusted before the rule is thought of ; that to resolve that point, the ordinary rules for the interpretation of wills ought to be resorted to; that when it is once settled, that the donor or testator has used words. of inheritance according to their legal import, has applied them intentionally to comprise the whole line of heirs to the tenant for life ; and has really made him the terminus or ancestor, by reference to whom the succession is to be regulated ; then comes the proper time to inspect the rule in Shelly's case ; that then, too, it will appear, that being considered according to the views from

which it (as he supposes) originated, it is perfectly immaterial whether the testator meant to avoid the rule or not; and that to apply it, and to declare the words of inheritance to be words of limitation, in the tenant for life, as the ancestor and *terminus* to the heirs, is a mere matter of course. That on the other hand, if it be decided that the testator or donor did not mean by the words of inheritance after the estate for life, to use those words in their full and proper sense; nor to involve the whole line of heirs to the tenant for life, and include all of his inheritable issue, and make him the ancestor or terminus for the heirs, but intended to use the word heirs in a limited, restrictive, and untechnical sense, and to point at such individual person as would be the heir, &c., of the tenant for life at his decease, and to give a distinct estate of freehold to such single heir, and to make his or her estate of freehold the ground work for a succession of heirs, and constitute him or her the ancestor, terminus, or stock, for the succession to take its course from; in every one of these cases the premises are wanting, upon which, only, the rule in Shelly's case interposes its authority, and the rule becomes quite extraneous matter."

Mr. Fearne, it is true, notices in the following pages what is entirely obvious, that this reference to the intention, in respect to the use of the word heirs, &c., produces some uncertainty in the application of the rule. But he concludes (page 192) that the rule cannot be discharged from this reference to the question, whether these words were or not used in a sense to comprehend the whole class of heirs described, "without exempting those words from all susceptibility of restriction, qualification, or explanation, from any other words or expressions in the will, a doctrine which (he says) is expressly negatived by those decided cases, in which the admission of the rule has been excluded by restrictive, qualifying, or explanatory expressions." And in page 187, after speaking of the propriety or necessity of resorting to some genral inferences afforded by a comparison of the

several cases in which the intention has been allowed to control the rule, he quotes, with approbation, that part of the argument of Judge Blackstone, in the case of *Perrin against Blake,* (decided about the year 1776,) in which he said that all the cases that had occurred from the statute of wills to that time, in which "heirs of the bodies" had been construed to be words of purchase, were reducible to these four heads : either (1st) when no estate of freehold was given to the ancestor, or (2d) where no estate of inheritance was given to the heir, or (3d) where other explanatory words were immediately subjoined to the former, or, lastly, (4th,) where a new estate of inheritance was grafted on the heirs of the body."

In the cases coming under the two first of these heads, the rule is so clearly inapplicable, that we suppose there has been no diversity of opinion respecting them, when it was once ascertained either that no freehold was given to the named ancestor, or that no estate of inheritance was given to his heir or heirs. The rule does not create an estate either of freehold or of inheritance, when one of them, only, is given. But where both are given, the freehold to the ancestor and the inheritance to his heirs, general or special, to take after him either mediately or immediately, it vests the inheritance in him, and the heirs must take by descent, if at all, unless on one of the grounds, coming under the third or fourth head, its application to the case is repelled, and the limitation in both of its branches takes effect according to the intention. With regard, however, to the sufficiency of certain words or circumstances to repel the application of the rule by showing the sense in which the words heirs or heirs of the body, were used in the conveyance, and also upon the question whether, in the particular limitation, a new estate of inheritance was grafted on the heirs or heirs of the body, there has been, at different periods, a great difference of opinion, and a corresponding diversity of decision, as more or less regard may have been paid by differ-

ent judges to the evidences of intention or to the rules of law which operate upon it. Without attempting to present, and much less to reconcile these diversities, we refer, for a partial exhibition of them, to the Essay of William Hayes, of the Middle Temple, and the analytical tables of cases appended thereto, as published at the close of the 7th volume of the Law Library, printed in 1835. We refer, also, to the case of *Prescott vs. Prescott's heirs*, 10 *B. Monroe*, 56, and the cases there cited, to show that the explanatory words or circumstances there deemed sufficient to repel the application of the rule, and to make the heirs of the body of the devisee for life take as purchasers, after having been decided to be sufficient in several British cases were, by a recent determination of the House of Lords, in opposition to the judgment of the Court of King's Bench, decided to be insufficient, and afterwards so held by the courts.

But whatever diversities of opinion or decision may have existed upon the question whether, by certain terms used in a conveyance to one for life, with a further limitation to his heirs or the heirs of his body, a new estate of inheritance has been grafted on the heirs as the stock from which the succession is to be traced as from its root, there is, as we believe, no case in which it has been decided that the rule in Shelly's case applies to a gift to one for life, and on his death to the heirs of his body, if a new estate of inheritance is, in fact, and clearly grafted upon the heirs of his body, and which, according to the law of descents and of entails, they could not, under the description of heirs of his body, take from him by descent.

In the case of *McNair's adm'r vs. Hawkins*, 4 *Bibb*, 380, which was a devise of land and slaves made in 1758, when by law slaves might be annexed to land and devised in tail, the testator gave his land and slaves to his daughter "Elizabeth and the children of her body, lawfully to be begotten, forever, which children of her body, lawfully to be begotten, to share the same

equally among them, be they son or daughter, or sons and daughters, after the decease of said Elizabeth." The court, after saying that in a will the word "children" might be deemed equivalent to the words "heirs of the body," decided that Elizabeth took but an estate for life and that her children took by purchase; because the estate was given to children both males and females, when by the law then existing it would have gone by descent to the eldest male, alone, so that "the manner in which the estate was limited over to them precluded all legal possibility of their taking by descent," and in the case of *Prescott vs. Prescott's heirs*, 10 *B. Monroe*, 59, the principle of the case just noticed, and of the other cases referred to, is said to be that the sense of the words "heirs of the body" was held to be restricted, and they were made to operate as words of purchase, by reason of such additional words or directions as broke the ordinary course of descent, and showed that the estate was not to descend from the first devisee.

Whether these two cases properly decide that upon the devises in question, the words indicating an estate by descent from the first taker were sufficiently qualified, either by additional explanatory words, or on the ground that a new estate of inheritance was grafted on the heirs of the body of the first taker, is not now the subject of inquiry. Wherever heirs or heirs of the body under that description take by purcease, they necessarily take a new estate, of which, if it be an estate of inheritance, they must constitute the stock or root from which the heirs or inheritors are to proceed. And if, on the other hand, it sufficiently appears that although the ancestor take a life estate by the same conveyance, they, as the heirs of his body, are intended to take a new estate of inheritance which they could not take by descent from him, either under the terms descriptive of his estate or under those in which they are described as his heirs, and under which alone they could take by descent from him, then as it would be legally impossi-

ble for them to take by descent from him the estate which is limited to them by the conveyance, they must take it by purchase. Such would be one of a new inheritance grafted on the heirs of the body of the first taker or donee for life, and whether it be considered with reference to the principles on which the application of the rule in Shelly's case depends, as understood and explained by Fearne and Hargrave in the observations above quoted, or with reference to the current of adjudged cases with respect to the words heirs of the body, as analyzed by Judge Blackstone, it is a case in which the words 'heirs of the body' should be understood in a restricted sense as words of purchase, applying to those persons who would be heirs of the body of the tenant for life at his decease, and not as words of limitation applying to the preceding estate, and operating to unite with that estate in the ancestor the estate of inheritance intended for the heirs. In such a case there is not, either by construction or by the operation of the rule in Shelly's case, any estate of inheritance either in fee tail or in fee simple in the donee for life, but the fee is in the heirs as purchasers, that is, by force of the gift, and not by descent.

What then is the nature of the deed before us, and of the limitations which it makes of the land which it conveys? Obviously the deed evidences a gift and not a sale. If not strictly a marriage settlement, it is at least a family settlement, by which a father makes provision for his children, and especially for his married daughter and her issue. Though in form a deed *inter partes*, it is in reality as much the act of the father alone who makes the gift, as a will is the exclusive act of the testator, requiring nothing from the donees, and leaving nothing for them to do, but to enjoy the gift which his benevolence has prompted. And as it proceeds from the same benevolent motives as a will, and is like it a pure donation, it should receive as such instruments

do receive the same benign interpretation with the view of effectuating the intention of the donor.

The limitation or conveyance made by the deed may be briefly stated, as being to John Pitman and Dorothy his wife during their joint lives and the life of the longest liver of them, and at their death or the death of the survivor, the deed says the land shall ensue and descend to the heirs of said John on the body of his present wife begotten, and shall vest in such heirs in fee simple. Had the deed stopped with the declaration that after the death of the survivor of the two donees for life, John and Dorothy Pitman, the land shall ensue and descend to the heirs of the body of John Pitman on the body of his wife Dorothy begotten, then John Pitman, after the death, would have been tenant in fee tail special. For there being then nothing to repel the application of the rule in Shelly's case, the estate of inheritance given to his special heirs by the deed, would, by operation of the rule, have vested in him, and merging the estate for life, would have made him immediate tenant of the estate described by the gift to him and the heirs of the body of himself and the wife designated. Or to use another form of expression, the words heirs of his body, &c., would have operated as words of limitation applying to and describing his own estate, and not as words of purchase indicating or securing any direct benefit to the heirs. And as these words would be taken as describing such an estate in him as would or might be descendable to the sort of heirs described by the words of inheritance or limitation, he must, as the law aforetime was, have had an estate in special fee tail, which the act of 1776 would have converted into an estate in fee simple, of which he would have had the absolute dominion.

But the deed does not stop with the limitation to J. Pitman for life, and at his death to ensue and descend to the heirs of the body of himself and his then wife; which under the rule would have been the same as a limitation to him and the heirs of the two bodies

mentioned. In addition to the direction that on the
death of the survivor of the two donees for life, the
land shall ensue and descend to the heirs of their
two bodies, it is also declared that *it shall be vested in
such heirs in fee simple*. In thus giving to them a fee
simple, or declaring that upon the death of the donee
for life, the heirs of his body by his wife Dorothy
shall have the land in fee simple, the deed limits an
estate to them which they could not take by descent
from a tenant in tail. And to use the language of
Chief Justice Boyle in the case before cited from 4th
Bibb, "the manner the estate is limited over to them
precludes all legal possibility of their taking by de-
scent" from John Pitman, that is it was legally im-
possible; (as the law aforetime was,) that an estate
tail in John Pitman should descend to the heirs of his
body in fee simple, and the limitation of the estate in
fee simple to them, shows that the words heirs of
his body, &c., were not used in their technical or
legal sense as comprising the whole line of heirs,
such as are described, and in which the estate was to
descend, but in the more restricted sense as designat-
ing the persons who, at his death or at the death of
the survivor of the two donees for life, would be the
heirs of their two bodies, and that it thus repels the
application of the rule and the idea of an estate tail.
It is moreover most obvious to our minds that this
deed, by its limitation of an estate in fee simple to
the heirs of the body of the donees for life, does
graft upon such heirs a new estate of inheritance of
which said heirs and not the donees for life, are to
be the root and stock from which the succession is to
flow and be accounted. This is manifest from the
consideration that the estate in fee simple in the heirs
of the body, who upon the death of the donee for
life might take that estate, would be descendable not
merely to the heirs of the body of John Pitman, but
to the heirs general of those who might be the heirs
of his body at his death, and therefore to persons who
were not only not descended from him, but not de-

scended from any of his ancestors. The heirs of the body are to have an estate different not only from that which the deed by its terms gives to the ancestor, but different from that which the rule of law, looking to all of the terms which could be regarded as applying to his estate, would give to him. And the estates being thus of different qualities, there seems to be the same reason for saying on that ground that they cannot coalesce, and the rule in Shelly's case does not apply, as there is for the same conclusion, where the estate for life is equitable, and the estate limited to the heirs is legal. In which case the doctrine is well established that the rule does not apply, and that the estates remain separate, notwithstanding the use of the word heir or heirs of the body of the donee for life.

But without recurring to this analogy, it is sufficient to rest this case upon the palpable ground that a new estate of inheritance is by this deed grafted upon the heirs of the body of the donee for life, which they could not take by descent from him, whether he be tenant for life or tenant in tail, and which therefore they must take under the deed and as purchasers or donees. In support of this principle, directly sustained by the opinions of Hargrave, Fearne and Blackstone, we refer to *Archer's case*, 1 *Coke* 66, to *Cheek vs. Day, Moore*, 593 ; to be found also in *Fearne on Remainders*, and to *Doe vs. Laming*, 2d *Burrow's Rep.* 1100. In the first of these cases, the gift was in substance to A for life, then to A's next heir male, and to the heirs male of the body of such next heir male. In the second it was "to A for life, and if A marry and have heirs of his body, to A's heir and the heirs of such heir." In the third case it was "to A, (not for life,) and the heirs of her body as well females as males, and their heirs and assigns forever, share and share alike as tenants in common."

The two first cases have been especially regarded as establishing the principle above stated, and hence

the reference in the quotation from Hargrave and
Fearne, *supra*, to the limitation, being to the heir in
the singular and his heirs, as showing that a new in-
heritance is grafted on the heir.   But the word heir
denotes descent, as certainly as 'heirs,' and is also
*nomen collectivum.*   And as the principle is, according
to all the authorities quoted, that the words 'heirs of
the body' may be words of purchase, and are so
when a new inheritance is grafted upon them, of
which they, and not their ancestor, are the root or
stock, it can only be necessary that the limitation be
such as to show plainly and unequivocally that a
new inheritance is grafted upon the heirs of the body.
There may, as already observed, be a difference of
opinion as to what may suffice to make this sufficient-
ly manifest.   But we think there can be no differ-
ence of opinion as to the effect of the limitation in
fee simple to the heirs of the body as made in this
case, as unequivocally showing that a new estate is
grafted upon them.   And we cannot doubt that the
words are sufficient to give them an estate of inheri-
tance of which they, and not their ancestor, the do-
nee for life, are the root and stock.

In the case of *Jarvis & Trabue vs. Quigley,* 10 B.
*Mon.* 104, this court applied to a deed of gift to the
relatives of the donor, the liberal construction appli-
cable to wills, upon the same principle on which that
rule of construction had been applied in England to
marriage settlements and covenants to stand seized.
And reference is made to 2d *Vesey, Sr.* 660, and 3d
*Atkyns,* 642.   The case of *Turman vs. White's heirs,*
14 *B. Monroe,* is an example of this liberal construc-
tion.   Applying the same principles to the construc-
tion of this deed, we are satisfied that the clause
"and shall be vested in such heirs in fee simple," ap-
plying to the land which it was before said shall en-
sue and descend to them, did give to the heirs an es-
tate of inheritance.   And as that estate could not
descend to them from the previous donees, it is obvi-
ous the word descend used just before means nothing

more than pass or go.   In the case of the *Attorney General vs. Wallace's devisees*, 7 *B. Mon.* 611, where the question was whether testator's daughter took an estate tail, it was determined that she took only an estate for life, although the testator said, I will all my real estate &c., to be entailed to her and her child or children.

Having thus determined the legal effect of the limitation to Pitman and wife and to the heirs of their bodies, by construction of the terms in which it is made, we deem it unnecessary to protract this opinion, by noticing subsequent expressions in the deed from which inferences might be drawn, either for or against the construction herein adopted.   We remark, however, that there is nothing in the subsequent parts of the deed which, in our opinion, can operate to give an estate tail to Pitman or to show that such was the intention of the grantors in the deed.   The sense of the words used in the primary and direct limitations being fixed, the same or similar words used as introductory to the subsequent limitations over, should receive the same interpretation, and should not change the effect of the primary limitations.   We refer to the case of *Moore vs. Moore*, 12 *B. Mon.* 651, and to the case of *Daniel vs. Thomson*, which, though first decided, is reported in 14 *B. Monroe*, as showing the interpretation and effect of the words 'dying without issue or without leaving issue or heirs of the body,' used in introducing ulterior limitations where the question of an estate tail in the first taker depends upon such subsequent introductory words.   We add that although we entertain great respect for the decisions of the courts of Virginia, we do not, for reasons stated in the last case above cited, feel bound to give conclusive effect either to their construction of the statute abolishing entails, or to their declaration of the law as it aforetime was in its application to the question of estates tail after the great changes made, not only by the act of 1776, but by other general laws affecting not only the rules of descent but

the modes of conveyance, and therefore the rules of construction. We do not, however, know of any Virginia decision directly applicable to a limitation such as is now before us, and we have been referred to none.

We are of opinion, therefore, that Pitman had only an estate for life in the land, and that the heirs of the body of himself and wife, living at his death, took a new fee simple, whence it follows that upon the facts now appearing, Mary J. Stephenson was entitled to recover one half of the land in contest in this case.

Wherefore, the judgment is reversed, and the cause remanded for a new trial in conformity with this opinion.